OPINION *Page 2 
{¶ 1} Defendant-appellant Leopoldo Prieto appeals after a bench trial in the Mahoning County Common Pleas Court. First, he claims there was insufficient evidence that he was the perpetrator of the shooting. Second, he alleges that counsel was ineffective for failing to call two alibi witnesses and for making certain statements at sentencing. Third, he urges that the court considered facts not in evidence at sentencing. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} On May 18, 2005 at nearly 1:00 a.m., the residences at 1341 and 1343 Berwick Avenue on the East Side of Youngstown were subjected to a barrage of gunfire from assault rifles. Sixteen-year-old Shylinda McBride was shot once through her lower leg, requiring surgery to repair bone. She resided at the 1341 address with her mother and grandmother while two of her brothers lived next door at the 1343 address.
 {¶ 3} Based on the victim's statement that Leo Prieto shot her, appellant was indicted for one count of felonious assault, two counts of improper discharge of a firearm into a habitation (one for each residence), and three gun specifications. Also charged were Henry Scott and Lamont Williams. Appellant's case proceeded to a bench trial on October 3, 2006.
 {¶ 4} Ms. McBride testified that she was sitting in the living room listening to music and studying for a test when the broken front door blew open. When she got up to close it, she looked over towards her brothers' house next door. She saw a person named Henry Scott and another unknown person holding "big" guns. They were running across the street as they started shooting at her brothers' house. (Tr. 25).
 {¶ 5} Before ducking back into her house, she looked forward, and in the light of a streetlight, she saw appellant walking across the street. (Tr. 25, 28). She testified that he was wearing a black hooded sweatshirt, black sweatpants and a hat. (Tr. 29). When asked about any unusual characteristics, she stated that appellant has "eyes that go different ways." (Tr. 33-34). She testified that appellant stopped, looked at her strangely, pulled a big gun out from behind his back and began firing at her house. (Tr. *Page 3 
29). She figured he fired approximately fifteen or sixteen shots and that she was hit with the third or fourth shot.
 {¶ 6} She limped down the hall screaming for her mother and exclaiming that Leo Prieto shot her. (Tr. 31). Her mother called 911 relating that her house was under fire and that her daughter had been shot. When the operator asked the identity of the shooters, the mother answered "Leo Prieto and them." The mother testified confirming that her daughter had immediately stated that Leo Prieto shot her. (Tr. 104). The mother also disclosed that she has known appellant for twenty years as he was once friends with her oldest children. (Tr. 107).
 {¶ 7} Lenny Vaughn, one of the victim's brothers who lived at the 1343 address, testified that he had received a telephone call earlier that day threatening that his house would be shot up by Leo Prieto and others. (Tr. 131-132). He stated that when he returned home from the store, he was worried because he saw a truck belonging to Lamont Williams in the driveway of Leo Prieto's mother, a few streets over. (Tr. 131, 133). He noted that the truck had not been there when he left for the store.
 {¶ 8} Mr. Vaughn related that he exited the vehicle in his driveway and spotted Leo Prieto rushing toward the house. (Tr. 134-135). Appellant was said to be wearing a black hooded sweatshirt, black jogging pants and gold eyeglasses. He was said to be dressed just as he had been when Mr. Vaughn saw him earlier that day, except that Mr. Vaughn did not believe appellant was still wearing his hat. (Tr. 155).
 {¶ 9} Mr. Vaughn ran in the house and yelled for his brother to get the guns. (Tr. 137). He explained that they had pistols for which they had just purchased bullets due to the threat earlier that day. (Tr. 147). Before any guns could be retrieved, gunfire erupted around them forcing them to take cover. (Tr. 137, 160). Mr. Vaughn admitted that he did not tell police that he saw appellant approaching his house until he was negotiating a plea in his own case the next year. (Tr. 164).
 {¶ 10} The detective assigned to the shooting testified that the victim told him that Leo Prieto shot her the first time he talked to her when he called her in the hospital some hours after the shooting. (Tr. 174, 180). He explained that the victim picked appellant out of a photographic array the next day. He disclosed that the victim *Page 4 
was initially hesitant in picking out his photograph, that she kept looking at her mother, and that she finally stated, "but, Momma, you know he shot me." (Tr. 180).
 {¶ 11} The defense called the patrolman who first responded to the scene. He was dispatched at 12:52 a.m. for the shooting which occurred at 12:50 a.m. (Tr. 212). His report stated that the victim had been walking through the house when she heard gunshots and felt pain in her leg. (Tr. 215). (A paramedic's report had a similar recitation of events. (Tr. 239).) When the responding officer was asked why his report listed the suspect as a black male with black hair around twenty years old, he advised that he made up these characteristics because there are certain fields that must be filled in or the computer will provide an error message. (Tr. 217). He insisted that neither the victim nor the mother advised him of the suspect's name or that the victim was an eyewitness.
 {¶ 12} Notably, the victim had testified that she did not remember speaking to a police officer on the scene. (Tr. 35). The victim's mother had testified that she barely spoke to the officer as she was too busy seeing her daughter off in an ambulance and assisting her disabled mother who was almost shot in her bed. (Tr. 112). She also implied that she was hesitant to name Leo Prieto due to his status as a long-time family friend.
 {¶ 13} The defense also called appellant's mother, Donna Copeland, to the stand. She identified her cellular telephone records, which showed that she placed calls to appellant's cell phone numerous times throughout that night/morning. Most calls were one minute long, which she attributed to her hanging up on his voice mail.
 {¶ 14} Ms. Copeland testified that she heard the gunshots from Berwick Avenue, a few streets over. She immediately called appellant to ensure his safety. Although her records show only a one-minute call to appellant at 12:51 a.m., she stated that she had a conversation with him. He allegedly told her that he heard the gunshots, he was "out the way", he was at his wife's mother's house one street over, and he would see her tomorrow. (Tr. 267-268, 304-305). Ms. Copeland reasoned that appellant could not have been the shooter because she could hear the gunshots in her neighborhood but could not hear any over the telephone while she was speaking to her son. (Tr. 282). *Page 5 
 {¶ 15} The court took the case under advisement. The next day, the court came on the record and specifically explained its thought process and credibility determinations. The court found appellant guilty of felonious assault, improper discharge regarding the house containing the victim and the two accompanying firearm specifications. However, the court found appellant not guilty of improper discharge regarding the other house. On January 9, 2006, the court sentenced appellant to eight years on each count to run concurrently plus an additional three years for the merged firearm specifications. Appellant filed timely notice of appeal.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 16} Appellant sets forth three assignments of error, the first of which contends:
 {¶ 17} "LEO PRIETO WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT ENTERED A JUDGMENT OF CONVICTION AGAINST HIM IN THE ABSENCE OF SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION."
 {¶ 18} Appellant contends that there was insufficient evidence to find that he was present at the scene of the shooting at 1341 Berwick Avenue. He reasons that when the court found him not guilty of improper discharge regarding the 1343 address, the court must have discredited Lenny Vaughn's testimony, which provided the only motive for the shooting. Appellant then describes the victim's testimony as equivocal. Appellant notes that the court questioned whether the victim's failure to flee before appellant joined the shooting made her more or less credible. He points to the court's statement that it was troubled by the responding officer's testimony concerning the initial lack of a suspect. Appellant also states that the victim's mother's statement to the 911 operator that Leo Prieto shot her daughter is not actually supporting evidence because the mother received her information from the victim.
 {¶ 19} Sufficiency is a question of law dealing with whether or not the evidence presented is adequate to support the conviction. State v.Thompkins (1997), 78 Ohio St.3d 380, 386. In determining sufficiency, the reviewing court evaluates whether any rational trier of fact could find the essential elements proven beyond a reasonable *Page 6 
doubt. State v. Goff (1998), 82 Ohio St.3d 123, 138. In doing so, the appellate court must view the evidence in the light most favorable to the prosecution. Id.
 {¶ 20} The only element contested here is appellant's identity as the person who shot at Shylinda McBride. Contrary to the state's initial argument here, the defense's stipulations did not waive a sufficiency argument. That is, the defense merely stipulated to venue, jurisdiction, that two homes were shot at, that the police were called, that the witness identified appellant as the person involved in the shooting and that the person charged was the defendant sitting in the courtroom. (Tr. 7-8). This does not admit that appellant was in fact the person involved in the shooting or that the witness is correct or credible. Thus, the state's first argument is wholly without merit.
 {¶ 21} Still, viewing the evidence in the light most favorable to the state, a reasonable person could find that appellant's identity was proven beyond a reasonable doubt. Ms. McBride knew appellant before the shooting. She saw him approach her house. They looked at each other for a moment. She watched him pull a big gun out from behind his back and fire shots at her. She saw/heard one of those shots hit the glass beside her head. She felt one of the next shots hit her leg. She immediately told her mom in an excited utterance that Leo Prieto shot her. This fact is established through her testimony, her mother's testimony and the unobjected to 911 tape, which bolsters their claim of the victim's immediate identification. Although she may not have repeated this identification to the responding officer as she was bleeding through a hole big enough for the surgeon to put a hand through, she provided the information to the first officer to contact her after she was settled in at the hospital. She later picked appellant's photograph out of an array and identified him at trial as the shooter.
 {¶ 22} Contrary to appellant's suggestion, motive is not an element. Regardless, the court did not wholly discredit Lenny Vaughn's testimony when it found appellant not guilty of shooting that house. Notably, Mr. Vaughn specifically stated that he did not see appellant shoot his house, nor did he see appellant carrying a gun. Since Ms. McBride saw the two people who shot her brothers' house and appellant was not one of them, the decision to acquit appellant of shooting one house and not the other was not illogical or reversible. *Page 7 
 {¶ 23} Although appellant does not specifically mention weight of the evidence, we shall briefly review such topic as his arguments on Ms. McBride's identification testimony deal with credibility more than the issue of sufficiency. Credibility of the witnesses and weight of the evidence are questions that are primarily the province of the fact-finder, who occupies the best position from which to observe the demeanor, gestures and voice inflection of the witnesses.Thompkins, 78 Ohio St.3d at 387; Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80. As such, a verdict is reversed on manifest weight of the evidence grounds only in exceptional circumstances. See id.;State v. DeHass (1967), 10 Ohio St.2d 230, 231. When there are two fairly reasonable views of the evidence, we do not choose which one is more believable. State v. Gore (1999), 131 Ohio App.3d 197, 201 (7th Dist.).
 {¶ 24} Here, Ms. McBride's testimony was not unbelievable or incredible. The trial court chose to credit her story as truthful. Such is the province of the fact-finder. A cellular phone record from a mother to her son lasting for one minute in length and occurring near the time of the shooting, the mother's claim that she spoke to her son this time rather than his usual voice mail, and her claim that it did not sound as if he was in the process of shooting or fleeing thereafter, does not destroy the validity of the victim's testimony.
 {¶ 25} Additionally, the victim's alleged failure to immediately seek cover does not render her testimony unbelievable. She was sixteen and likely shocked by what she was seeing. Moreover, appellant suggests that the victim's story requires her to have stood there gawking for some minutes. Yet, the time it took her to look out and see two people shooting at a house then turn her head forward and watch appellant point and shoot a gun at her was likely very minimal, such as a matter of seconds. Additionally, the defense elicited the fact that she fleetingly thought that appellant, a friend of the family, may have been there to save her. (Tr. 79-80).
 {¶ 26} Although the court could have disbelieved the testimony of the victim's brother placing appellant at the scene and even the testimony of the victim placing appellant shooting a gun at her, the court was not required to do so. Thus, appellant's convictions were not against the manifest weight of the evidence. *Page 8 
 {¶ 27} Finally, although a sufficiency argument is not the proper place to raise an evidentiary issue, we briefly dismiss the vague intimation that the victim's mother should not have been permitted to testify that the victim immediately told her that Leo Prieto shot her. First, there is no question that the victim's statement qualified as an excited utterance. Evid.R. 803(2). The statement related to a startling event or condition and was made while the declarant was under the stress of excitement caused by the event or condition. Second, appellant stipulated to the admission of the 911 tape, which established that the mother told the 911 operator that Leo Prieto was shooting at the house. (Tr. 8-9). Third, contrary to appellant's suggestion, merely because a person testifies at trial does not mean that a prior hearsay-excepted statement is no longer an "out of court statement." See Evid.R. 803 (listed exceptions are permitted hearsay even if declarant is available as a witness). For all of the foregoing reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 28} Appellant's second assignment of error alleges:
 {¶ 29} "MR. PRIETO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL * * *."
 {¶ 30} In seeking reversal for alleged ineffective assistance of trial counsel, the defendant must establish deficient performance which caused prejudice to the defense. Strickland v. Washington (1984), 466 U.S. 668,687; State v. Bradley (1989), 42 Ohio St.3d 136, 142. This statement breaks down into a two-pronged test: deficiency and prejudice.
 {¶ 31} In order to establish that counsel's performance was deficient, the defendant must demonstrate that the performance fell below an objective standard of reasonable representation by the commission of a serious error. State v. Keith (1997), 79 Ohio St.3d 514, 534. Counsel is generally presumed competent. State v. Thompson (1987), 33 Ohio St.3d 1,10. We do not use hindsight to second-guess instances of trial strategy that backfire as there is a wide range of professional competence and of appropriate trial tactics. State v. Carter (1995), 72 Ohio St.3d 545,558. *Page 9 
 {¶ 32} To then demonstrate that he was prejudiced by the deficient performance, the defendant must prove that there exists a reasonable probability that were it not for counsel's errors, the outcome of the proceedings would have been different. Keith, 79 Ohio St.3d at 534. In evaluating prejudice, we thus consider whether our confidence in the outcome is undermined. Bradley, 42 Ohio St.3d at 142.
 {¶ 33} First, appellant contends that counsel was ineffective by failing to call appellant's wife and mother-in-law as alibi witnesses. He points to the testimony of his mother, who stated that when she spoke to appellant an hour before the shooting and one minute after the shooting he told her that he was at his wife's mother's house, which is incidentally a few streets from the shooting. He cites a case from the Twelfth Appellate District which found that the failure to subpoena an alibi witness in that case was ineffective assistance of counsel.Middletown v. Allen (1989), 63 Ohio App.3d 443, 448 (record showed that defense counsel made defendant responsible for subpoenaing his friends, and no notice of alibi was filed).
 {¶ 34} Initially, we must point out that appellant's wife was named as an alibi witness on the notice of alibi filed August 15, 2006 (which stated that he was in Akron with his wife) and the amended notice of alibi filed September 27, 2006 (which stated that he was at a residence on Forestview Avenue in Youngtown). As conceded in appellant's brief, defense counsel did subpoena her to testify. Likewise, the record demonstrates that appellant's wife did in fact appear to testify and that she left the courtroom at the separation of witnesses. (Tr. 9).
 {¶ 35} Why defense counsel did not end up calling her to the stand is unknown. For all we know, the alibi she was to give was fabricated, and thus, she backed out of the story at the last minute. Moreover, whether the mother-in-law was home or awake and aware at the time appellant was allegedly at her house is unknown. If she was home and awake, it is also possible that she would have testified that appellant was not at her house. Sound trial tactics may have supported counsel's decisions here. See State v. Baker, 12th Dist. CA2005-11-103, 2006-Ohio-5597, ¶ 9 (a later Twelfth District case).
 {¶ 36} Where the evidence supporting a claim of ineffective assistance of appellate counsel is de hors the record, the subject is not available for analysis in the *Page 10 
direct appeal. See, e.g., State v. Hartman (2001), 93 Ohio St.3d 274,299; State v. Carter (2000), 89 Ohio St.3d 593, 606; State v.Madrigal (2000), 87 Ohio St.3d 378, 390-391. The appellate court addressing a direct appeal is not permitted to add matter to the record which was not part of the trial court proceedings. See, e.g., State v.Hill (2001), 90 Ohio St.3d 571, 573, citing State v. Ishmail (1978),54 Ohio St.2d 402. We have no recorded evidence of deficiency or prejudice. Consequently, we cannot find ineffective assistance of counsel on this record.
 {¶ 37} Next, appellant complains about comments his counsel made at sentencing. He believes his counsel compared him with international terrorists and suggested that he was involved in drugs. He concludes that counsel should have painted a more positive picture of him. The state responds that counsel was just placing the events in a context.
 {¶ 38} The following excerpt is cited by appellant:
 {¶ 39} "What to say about Leo Prieto? The man, the myth, the legend. Everybody on the east side of Youngstown knew Leo Prieto. They knew him from his days in the street. They knew that he was tough. They knew he had a family. They knew he had been involved in crimes.
 {¶ 40} "* * *
 {¶ 41} "I don't think anybody really wants to talk about the 800-pound elephant in the room, but drugs are at the center of this case, drugs and money and revenge. And it's broken every taboo and folkway and moral that we have in society to the point the east side of Youngstown is called the wild, wild east where shootouts, unfortunately, are common. I think we heard that from witnesses on both sides of this case. It's like living in Beirut or Baghdad listening to gunfire all the time." (Tr. 6-8).
 {¶ 42} Contrary to appellant's complaint, counsel did not blame the common gunfire on the East Side on appellant; nor did counsel compare him to those that create the destruction in Iraq. Some of counsel's statements could be described as putting the events in the context of where they took place.
 {¶ 43} As for the mention of appellant's involvement in crimes, such fact was part of the presentence investigation ordered by the court. This PSI showed numerous arrests and many convictions, some for drug offenses. In fact, one of his drug *Page 11 
convictions was based upon a seizure of 1,041 grams of marijuana. His arrest record also shows that he was often present around high-powered weapons and drug dealing apparatuses.
 {¶ 44} Most importantly, appellant maintained his innocence at sentencing and wished the court to consider why he might reasonably be targeted as a suspect or assumed to have been responsible. That is, part of the defense's sentencing strategy was to portray appellant as a reformed drug dealer, who has stayed out of trouble since his 2002 arrest. The defense pointed out that appellant had moved to Akron with his wife, obtained a landscaping job, stayed clean, and he had almost completed his three years of probation when the current allegations arose.
 {¶ 45} Moreover, appellant spoke at sentencing on his own behalf. He expressed sympathy for the victim but insisted that he did not commit this offense. He described his situation as "a case of my past come to haunt my future." (Tr. 13). Thus, invocation of East Side gunfights and drug trade were part of a sentencing strategy approved by appellant himself. We also note that the judge referenced a letter written by the defendant to the court, which also seemed to invoke this strategy.
 {¶ 46} In conclusion, a defendant is not entitled to counsel who always makes the most brilliant statements, but rather, he is entitled to counsel whose decisions fall within the wide range of reasonable professional assistance. State v. Baker, 7th Dist. No. 03CO24,2003-Ohio-7008. Debatable trial tactics rarely constitute ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 47. There is a strong presumption that counsel's choice of tactics constitutes a sound strategy: "A court must presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of a tactical decision and do not constitute ineffective assistance of counsel." State v. Kovac, 150 Ohio App.3d 676, 2002-Ohio-6784, ¶ 65.
 {¶ 47} As such, although a better sentencing strategy may have been to forgo such comments, counsel's performance was not rendered ineffective by the two disputed paragraphs of commentary. Counsel's performance at sentencing falls within the range of professional assistance, and prejudice is not apparent. ASSIGNMENT OF ERROR NUMBER THREE {¶ 48} Appellant's third and final assignment of error provides: *Page 12 
 {¶ 49} "THE TRIAL COURT ERRED IN CONSIDERING FACTS NOT PRESENTED AT TRIAL IN MAKING HIS SENTENCING DETERMINATIONS."
 {¶ 50} The state recommended maximum, consecutive eight-year sentences plus one firearm specification for a total of nineteen years. The defense suggested five-year concurrent sentences plus a firearm specification for a total of eight years. The court imposed maximum, concurrent eight-year sentences plus one firearm specification for a total of eleven years. On appeal of his sentence, appellant takes issue with the following statement of the court at sentencing:
 {¶ 51} "I am certainly not blind to the fact based upon the testimonyintroduced at trial that this incident is a longstanding one; that the players involved are, unfortunately involved because of cocaine and crack cocaine; that this epidemic has certainly caused a problem in society that is not easily fixed." (Tr. 16-17) (emphasis added by appellant).
 {¶ 52} Appellant states that the record does not support the conclusions reached by the trial court mainly because the transcript does not reference drugs. Thus, he concludes that his due process rights were violated when the court punished him for facts other than those in the record.
 {¶ 53} However, it was defense counsel who asked the court to consider the fact of drugs being the impetus for the victims' brothers having their house shot up and for their family pinning the blame on appellant, who was previously also involved in drugs. The defense wished the court to realize that appellant may have been wrongly accused due to the revenge mentality and competition involved in the drug trade or due merely to the family's incorrect assumptions about appellant's continued involvement in the trade. Since the reference was first made by the defense, the court could take the drug context into consideration as requested.
 {¶ 54} As for the incident being the result of a long-standing relationship, this is supported by the record at trial and at sentencing. At trial, testimony established that the victim's family knew appellant for twenty years. The victim's brother stated that he attributed a threatening telephone call to have come from appellant. The victim's own sister testified at sentencing that she grew up with appellant, and she even urged that *Page 13 
appellant did not deserve a maximum sentence because "foul play" was on both sides. (Tr. 5).
 {¶ 55} Regardless, there is plenty of support for an eight-year maximum sentence here without regard to the statement about drugs. That is, appellant, who was twenty-six years old at the time of the offense, has a criminal arrest history involving drugs, guns, stolen property, and even some violence where appellant physically assaulted a teen and where appellant's co-defendant fired shots at that victim. See State v.Burton (1977), 52 Ohio St.2d 21, 23 (holding that it is well-established that the sentencing court can consider arrests even if no indictment and conviction resulted). The following arrests resulted in convictions: carrying a concealed weapon, inducing panic, possession of marijuana (reduced from aggravated trafficking with a gun specification), possession of drug paraphernalia, drug abuse marijuana two different times, menacing (reduced from intimidation of a witness), conspiracy to felonious assault (involving the co-defendant who fired shots), receiving stolen property (a vehicle), and a later charge for unauthorized use of a motor vehicle.
 {¶ 56} As a matter of fact, he was on community control for receiving stolen property when he committed an unauthorized use of a motor vehicle offense and when he committed the present offenses. He failed to fulfill his child support obligation, which totaled $3,000, as requested by his probation officer even though his current support was only $50 per month. There is also evidence that he moved back to Youngstown from his Akron address without informing his probation officer.
 {¶ 57} In addition, the young victim suffered serious physical harm. She has suffered bone infections, and amputation was feared at one point. She continues to experience pain and disability and will need surgeries in the future. She has also suffered psychological harm as she lives in fear and has trouble sleeping at night. (Tr. 4). Furthermore, in considering the nature of the act at issue herein, appellant could have been charged with attempted murder. State v. Robinson (1954), 161 Ohio St. 213, paragraph five of the syllabus (can infer intent to kill from the surrounding circumstances where the natural and probable consequence of a defendant's action is to produce death, such as when repeatedly firing a gun at someone). *Page 14 
 {¶ 58} There is an extreme likelihood of recidivism, and this was one of the worst forms of the offenses. These are prior statutory requirements that can now be used as guidelines in the court's exercise of sentencing discretion. State v. Moore, 7th Dist. No. 06MA60,2007-Ohio-1574, ¶ 9.
 {¶ 59} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 Donofrio, J., concurs. Waite, J., concurs. *Page 1