[Cite as *State v. Yost*, 2025-Ohio-380.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

STETSON J. YOST,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 CO 0016**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2023-CR-34

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino,* Prosecuting Attorney, *Atty. Shelley M. Pratt*, Assistant Prosecuting Attorney, Columbiana County Prosecutor's Office*,* for Plaintiff-Appellee and

*Atty. John P. Laczko, LLC*, for Defendant-Appellant.


Dated:  February 5, 2025

**Robb, P.J.**

{¶1} Defendant-Appellant Stetson J. Yost appeals his convictions of rape and gross sexual imposition after a jury trial in the Columbiana County Common Pleas Court. He contends the trial court erred in allowing the child-victim's friend to relay hearsay about what the victim told him. It is also alleged the court committed plain error in allowing expert testimony on the victim's psychological diagnoses and self-harm, which Appellant believes was akin to allowing an opinion on the child's veracity. He argues counsel was ineffective for failing to object on this basis and raises two other allegations of ineffectiveness. Lastly, he says the convictions were contrary to the manifest weight of the evidence. For the following reasons, Appellant's convictions are upheld, and the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} On January 11, 2023, Appellant was indicted on two counts after he was accused of perpetrating various sexual activities against his girlfriend's child when she was between ten and twelve years old. The first count charged him with rape for sexual conduct with a child under the age of thirteen in violation of R.C. 2907.02(A)(1)(b) (a first-degree felony carrying a life sentence). The second count charged him with gross sexual imposition for sexual contact with a child under the age of thirteen in violation of R.C. 2907.05(A)(4) (a third-degree felony).

{¶3} At the jury trial, the victim testified Appellant began living with her family when she was seven years old. She initially had a good relationship with him and considered him to be her father. (Tr. 344-346). He was involved in her discipline and would pull her pants down to spank her. (Tr. 346). She remembered him first coming into her bedroom to touch her when she was approximately ten years old, noting it was when her pubic hair first started growing. (Tr. 347). Appellant thereafter entered her room at night to touch her on multiple occasions; she would pretend to sleep and assumed he did not know she was awake. (Tr. 349-350).

{¶4} According to the victim's testimony, Appellant would regularly put his hand under her clothing and touch the outside of her vagina. (Tr. 347-349). He touched her breasts and buttocks under her clothes as well. (Tr. 349). In addition, Appellant would

put her hand on his penis. When asked what he did to her hand once he put it on his penis, she testified, "More than just hold." (Tr. 350).

{¶5}   At one point, the victim tried to address the situation with her mother by mentioning Appellant came to her room and pulled her arm toward him. The victim said this caused family problems and screaming arguments between Appellant and her mother. Appellant declared it must have been a dream and encouraged her to agree. (Tr. 348).

{¶6}   One day, when she was grounded and her mother and younger sister were away from the house, Appellant asked the victim if she wanted to play a game. He blindfolded her eyes, tied her hands, removed her clothing, and took photographs. (Tr. 350-351). He put a lollipop into her mouth, and then, he put what she initially believed to be his fingers into her mouth. Upon opening her eyes under the blindfold, she could see that he actually put his penis in her mouth (and he did so more than once during that "game"). The victim then extracted herself from the game by saying she had a headache and wanted to go to bed. (Tr. 351).

{¶7}   When asked why she did not report this incident to her mother, she said she was confused, he was the only father figure she knew, she did not want to break her mother's heart, and she was scared (noting he once flipped the couch over with her mother on it). (Tr. 352-353, 370). The victim testified Appellant frequently yelled at her and called her a whore; at times, she tried to anger him with hopes it would discourage him from coming to her room at night. (Tr. 352-353).

{¶8}   Appellant moved out of their house in 2019, but the victim's mother invited him to the victim's thirteenth birthday party in the spring of 2020. This prompted the victim to complain about his presence at the party to a male friend in texts; she had previously told this friend about being sexually abused by Appellant. (Tr. 284-285, 353). Her mother viewed the texts while transferring data to the new phone the victim received for her birthday. (Tr. 285, 353). When asked about the texts the next morning, the victim disclosed the sexual abuse to her mother. (Tr. 286, 353).

{¶9}   The victim's mother testified Appellant lived with them from 2015 until 2019, when the victim was twelve years old. (Tr. 278, 282). She regularly left her two daughters home with Appellant when she was in school or at the gym. (Tr. 282). Her children called

him dad; the victim initially had a good relationship with him, which eventually turned hostile. (Tr. 280, 306). For instance, the victim's mother heard Appellant scream at the victim for lengthy periods of time, call her a whore once when she showed interest in a boy, and restrict her clothing choices. (Tr. 281). She permitted Appellant to discipline the kids, including by spanking, but protested once when she saw him hit the victim in the mouth. (Tr. 307-308).

{¶10} The victim's mother testified about ejecting Appellant from her home in September 2019 after catching him in the victim's room taking photographs of the sleeping victim late at night. When confronted, Appellant claimed he was looking at a water bottle on the floor. The victim's mother testified she went through Appellant's phone while he was sleeping and confirmed he took photographs of the sleeping victim in "short shorts." (Tr. 282). In anger, she broke the phone in question (which was a spare phone he used for games). (Tr. 283). She said Appellant then claimed he took the photographs to show the victim how "inappropriately it was that she was sleeping." (Tr. 283).

{¶11} When the victim's mother later asked the victim if she was uncomfortable with Appellant, the victim responded in the negative, and the mother dropped the subject with the victim. Although no longer living with Appellant, the victim's mother kept in contact with him and invited him to the victim's birthday party.

{¶12} After discovering the victim's texts to a friend on the night of the victim's birthday and hearing the victim's disclosures about being sexually abused by Appellant, she confronted Appellant at the place he was staying and sought to obtain her extra house key from him. (Tr. 287). When Appellant left the confrontation by driving to her house to speak with the victim, the mother called her neighbor and asked her to retrieve the children before Appellant arrived. (Tr. 287-288).

{¶13} The mother testified she reported the matter to police a few months later (in the summer of 2020) because the victim was suicidal and not yet ready for an investigation to commence. (Tr. 288, 287-298). In the meantime, Appellant mailed three letters to their house, one for the mother, one for the victim, and one for the victim's younger sister. The victim's mother disposed of her own letter after getting mad while reading it in her car and then placed the children's letter in her glove compartment without reading them. After time passed, she opened those letters. Before reading the letters at

trial, she attested to recognizing his handwriting, noting she had previously read journal entries and Christmas letters he penned. (Tr. 292).

{¶14} In his letter to the victim's younger sister, Appellant said he loved her and would miss her while stating, "I can't come around anymore. I did bad things and hurt your sister. Because of that, I don't deserve to be your dad and I won't be able to see any of you again . . . None of this is your fault. Nor is it [the victim's] or your mom's fault. It's all mine." (St.Ex. 6). He also wrote, "I can't change what I did and I won't be able to make up for it. Some mistake and action can't be taken back or forgiven. Please remember that and treat people better. . ." *Id.* In his letter to the victim, Appellant said:

> I am truly very, very sorry for the inappropriate things I did to you and how much they affected you. I want you to know that I really do love you more than anything in the world. It's just that my love wasn't something a father should feel toward a daughter nor was it something an adult should feel for a child. I knew that but I couldn't change it. You mean the world to me and I never meant to hurt you. I knew you'd never feel the same towards me and, in my own weakness and twisted ways, I took advantage of you.

> Please do not let this ruin your life. I'm not asking you to forgive me or to forget but I'm hoping you can learn to let it go and live happily. I wish you would have talked to me about this. That you would have let me know that you knew what I did and how it bothered you. I'm so sorry. Your happiness was my happiness. When you smiled, I smiled. When you were sad or hurt, I was sad and hurt. I really never knew how much I had hurt you.

> I hope you can move past this and let go of the bad things I've done. I know now that I was nothing but a monster to you and that I ruined everything. Please find a way to move on and to smile again.

> I just wish I knew that our whole relationship, our time together wasn't all fake. I thought you loved me and liked hanging out and doing things . . . But I will also never forget the pain I've caused you or how I ruined everything . . . Again, I really am sorry and really do love you with all my heart. You never have to see me or hear from me again. I will never fill the

hole in my heart from what I've done or losing you but I hope you can fill
yours in a good way.

(St.Ex. 7). The victim's mother testified she vomited after reading this letter and never showed it to the victim. (Tr. 291).

{¶15} After the victim informed her mother she was ready to report the sexual abuse to the police, she became more distant and depressed, experienced high anxiety, and engaged in self-harm (including the cutting of her arms and legs). As a result, a physician prescribed psychiatric medication, and she was admitted to a mental hospital in December 2020. (Tr. 297-299, 328-329). The victim had prior issues with self-harm (including eraser burns). (Tr. 323).

{¶16} The victim's friend testified he dated the victim in 2020, when they were twelve years old. He said around the time she turned thirteen, she told him shocking things about a man named Stetson whom she described as her stepdad. (Tr. 270). Over objection, the friend recapped her disclosure to him (which was a general description of what the victim testified to at trial and which is discussed in assignment of error one). (Tr. 271-272).

{¶17} A caseworker from Children Services testified to receiving the report of abuse, reading Appellant's letters, and observing the victim as she was interviewed at the child advocacy center. (Tr. 220-242). The caseworker additionally said she learned about the victim's admission to a mental hospital and mental health diagnoses (which is quoted in assignment of error two along with the nurse practitioner's similar testimony). (Tr. 244-245).

{¶18} The nurse practitioner testified she conducted an examination of the victim after watching the interview through a mirror. (Tr. 392-394). She spoke of the importance of obtaining a medical history from a child's parent and also recited the victim's psychosocial history upon admission to the mental hospital. (Tr. 382, 388, 407).

{¶19} The jury watched the video interview wherein the victim provided details consistent with her testimony at trial. For instance, she said while she was sleeping in her room, Appellant would "play" with the outside of her front private part under her clothes and put her hand on his penis while sliding it up and down. She estimated the touching conduct occurred on twenty separate occasions. She additionally spoke of Appellant

once putting his penis in her mouth after a lollipop while she was blindfolded. During the interview, she mentioned recently being in a mental institution for depression and suicidal thoughts. (St.Ex. 10).

{¶20} The defense presented testimony from Appellant's female cousin, who was four years older than the victim. After stating Appellant babysat her as a child, she said she could not envision him doing something like this. (Tr. 426, 429).

{¶21} Appellant then took the stand and declared the victim's allegations were not true. (Tr. 441, 460). He acknowledged yelling a lot, calling the victim a whore and a slut one time each, disciplining the victim by spanking her (with her mother's permission), and hitting the victim in the face three times for "mouthing off." (Tr. 447-455). He also prohibited her from having a boyfriend and monitored what she wore and what books she read. (Tr. 456).

{¶22} Regarding the victim's initial disclosure to her mother about him, Appellant mentioned a claim that he entered the victim's room at night and pulled her arm toward him; he said this occurred in early 2019 during a standard nightly check on the children. He insisted he was merely pulling the sleeping victim's thumb out of her mouth as instructed by a dentist and adjusting her body so she did not fall out of bed; he claimed he would uncover the sleeping children if they looked hot (just as he would tuck them in if they looked cold). (Tr. 501-502).

{¶23} As to the September 2019 accusation about taking photographs of the sleeping victim, he testified he merely turned on his phone flashlight after stepping on a water bottle while doing the "nightly routine" of checking on the girls; he denied the allegation by the victim's mother about finding photographs on his phone. (Tr. 459-462). He pointed out the two children shared a room and "kept their halves of the room." (Tr. 458).

{¶24} Regarding the victim's oral sex disclosure, Appellant testified the victim wanted to play a game with "her favorite lollipops" to show she could guess any flavor. He admitted to blindfolding her for this purpose. (Tr. 464-465). He denied placing his fingers or his penis in her mouth. (Tr. 465).

{¶25} When asked about the letters he wrote, he asserted he was not apologizing or admitting sexual behavior. He said the letter's reference to "inappropriate things" he

"did to" the victim was merely a reference to name-calling, slapping, and controlling behavior. (Tr. 469). He claimed his admission that he loved her in a way a father should not feel for a daughter and in a way that no adult should feel for a child was not meant to refer to sexual or romantic feelings. (Tr. 470). He also said the acknowledgment that he "took advantage" of her due to his "weakness and twisted ways" while knowing she would "never feel the same towards" him merely referred to the way he forced her to be involved in recreational activities with him. (Tr. 474).

{¶26} The jury found Appellant guilty as charged. The court imposed sixty months for gross sexual imposition followed by a consecutive life sentence for rape of a child under thirteen years of age. (4/16/24 J.E.). Appellant filed a timely notice of appeal.

## ASSIGNMENT OF ERROR ONE

{¶27} Appellant sets forth four assignments of error, the first of which provides:

"THE TRIAL COURT ERRED IN ALLOWING HEARSAY TESTIMONY FROM [THE VICTIM'S FRIEND] AND CAUSING PREJUDICE TO APPELLANT."

{¶28} The victim's friend testified he dated her in 2020, when they were twelve years old. Around the time she turned thirteen, the friend was "really shocked" to hear the victim speak of sexual abuse perpetrated upon her by a man named Stetson, whom she described as her stepdad. The friend said, "She would usually be crying or, like, really upset, like, you could just hear it in her voice about how, like, sad she actually was." (Tr. 270). When asked what the victim told him, defense counsel objected.

{¶29} The prosecutor argued because the victim was "overborne with emotion" and crying on the phone, the statements were admissible under the hearsay exception for an excited utterance (or for a present sense impression). Defense counsel pointed out nothing happened immediately before the statements in April 2020. (Tr. 271).

{¶30} The court overruled the objection ruling that even "if it was hearsay offered for the [truth] of the matter asserted," it was admissible under an exception. (Tr. 271-272). The friend then testified to the following contested statements:

> she started out by telling me that whenever it'd be late at night, Stetson would come up to her room, and he would just, like, honestly yell at her for hours on end. He would touch her in ways she wouldn't want to be touched. And even told me about a time that he made her suck on his dick. And

honestly, like, really shocked me. And then she started telling me about how most of the stuff that would happen would happen in her sleep or, like, when she was half awake so she didn't fully know what was going on.

(Tr. 272).

**{¶31}** Appellant argues these statements by the victim were offered to prove the truth of the matter asserted and did not satisfy a hearsay exception. He urges the April 2020 statements were too far removed from the events being addressed, the last of which occurred sometime prior to September 2019 (which is when the victim's mother ejected Appellant from the home upon finding him taking photographs of the sleeping victim). Appellant says the fact that the victim was crying and really upset would not transform the statements, which were purely a recitation of memories after reflection.

**{¶32}** The state points to the trial court's broad discretion when evaluating the factual basis for admitting evidence. Insisting the excited utterance hearsay exception applies, the state points out, "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought." *State v. Taylor*, 66 Ohio St.3d 295, 303 (1993). The state notes this premise is more important in a child rape case. *See id.* It is urged Appellant's presence (or anticipated presence) at the victim's birthday triggered a qualifying nervous state.

**{¶33}** Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802. If the statement is not offered for the truth of the matter asserted, it is not prohibited by the hearsay rule. *State v. LaMar*, 2002-Ohio-2128, ¶ 57.

**{¶34}** The excited utterance hearsay exception allows the admission of a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). In order for

an excited utterance to be admissible, four factors must be satisfied: (1) the event must be startling enough to produce a nervous excitement in the declarant; (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event. *Taylor* at 300-301.

**{¶35}** *"*Merely being 'upset' clearly does not meet the standard for admissibility under Evid.R. 803(2) because it does not show that [the] statements were not the result of reflective thought." *Id.* at 303. The Supreme Court has approved of the "trend of liberalizing the requirements for an excited utterance when applied to young children who are the victims of sexual assault" and allowing a "substantial lapse of time" because "children are likely to remain in a state of nervous excitement longer than would an adult" (and also because they have "limited reflective powers"). *Id.* at 304.

**{¶36}** In finding counsel was not ineffective for failing to object to hearsay, this court described a twelve-year-old victim's disclosure to a friend as an excited utterance where: the victim was ten years old when the sexual abuse began; the friend testified the victim was crying and scared immediately before she disclosed the abuse; and the victim testified she was afraid of the defendant and had just heard her mother talking about the defendant before making the disclosure to her friend. *State v. Palmer*, 2022-Ohio-2643, ¶ 18 (7th Dist.). We alternatively found the testimony was harmless even if it would not qualify as an excited utterance. *Id.* at ¶ 20-21.

**{¶37}** As pointed out in *Palmer*, "[the victim's] testimony as to the sexual abuse rendered any admission of [the friend's] testimony harmless because it was essentially cumulative." *Id.* at ¶ 21. As the state points out, "The purpose of the rule against hearsay is to keep unreliable evidence, particularly evidence that is not subject to cross-examination, away from the jury or trier of fact." *State v. Bradley*, 2012-Ohio-5880, ¶ 39 (7th Dist.).

**{¶38}** Here, the victim testified to the allegations, and her interview at the child advocacy center was played. In accordance, even assuming arguendo the statements to the friend were not excited utterances, the friend's testimony briefly summarizing the victim's disclosures was harmless in this case.

Case No. 24 CO 0016

{¶39} Furthermore, as additionally pointed out in *Palmer*, testimony recapping a testifying victim's earlier disclosure may be harmless if such recap was "part of the timeline of the events concerning the sexual abuse" disclosure triggers. *Id.* at ¶ 20 (emphasizing the friend's testimony "was presented more for background or a timeline as opposed to the 'truth of the matter' because [the victim] testified right after [the friend] and she related firsthand the sexual abuse that she suffered"), citing *State v. Gutierrez*, 2011-Ohio-3126, ¶ 49 (3d Dist.) (a mother's testimony on her child's disclosure of sexual abuse was not erroneously admitted where the purpose was to explain the timeline and the child's behavior; even if it was error, it was harmless error because the child testified as to the abuse). Here, the friend's summary of the victim's initial disclosure to him as her first confidante was part of the timeline and part of the reason for her subsequent disclosure to her mother (who discovered later texts to this friend).

{¶40} We also point out a prior consistent statement is admissible to rebut a charge of recent fabrication. Specifically, a statement *is not hearsay* if: "The declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is . . . consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive . . ." Evid.R. 801(D)(1)(b). In ruling on the objection to the friend's testimony, the trial court indicated the statement may not even be hearsay (and then alternatively ruled it was admissible under a hearsay exception in any event).

{¶41} Here, defense counsel's opening statement suggested the victim was angry that Appellant was invited to her birthday party by her mother and thus started texting her friend stories about Appellant, which her mother then read that night after the party. (Tr. 211-212). This could be considered akin to an explicit or implicit charge of recent fabrication or improper motive. *See State v. Martin*, 2024-Ohio-5332, ¶ 22-31, 36, 46-48 (7th Dist.) (attacks on the victim's credibility during opening statements may be grounds for admitting a prior consistent statement under Evid.R. 801(D)(1)(b) to rebut accusations of improper motive or recent fabrication). Notably, the friend's testimony gave the impression the victim gradually disclosed the sexual abuse to him. And, the contested statements he summarized in his testimony occurred in phone calls with the victim; he spoke of how during the disclosures he could "hear it in her voice about how, like sad she

actually was." It would thus appear the texts between the victim and the friend read by the victim's mother were referring to the allegations that were *previously disclosed by the victim verbally to the friend*. In accordance, it could reasonably be concluded the friend's testimony was not hearsay as it presented a prior consistent statement by the victim.

**{¶42}** In any event, the friend's general retelling of statements the victim already specified was harmless, as discussed above. For the various reasons discussed above, this assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

**{¶43}** Appellant's second assignment of error contends:

"THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING EXPERT WITNESSES [THE CASEWORKER] AND [THE NURSE PRACTITIONER] TO GIVE THEIR OPINION ON THE VERACITY OF THE TESTIMONY OF THE ALLEGED VICTIM."

**{¶44}** Appellant argues the court erred in failing to sua sponte exclude (as improper veracity vouching) certain testimony by the caseworker and the nurse practitioner while disclosing the child's prior mental health diagnoses. The caseworker's testimony explained why the child advocacy center interview occurred two months after she received the report: various individuals were quarantined due to Covid-19 protocols and then the victim was in a mental hospital in December 2020. (Tr. 235-236). She subsequently testified to learning from the hospital's medical records that the victim was "diagnosed with PTSD, major depressive disorder with psychotic features, insomnia, and an unspecified eating disorder." (Tr. 245). When the caseworker said the records also indicated the victim engaged in self-harm, the prosecution asked if, based on her training and experience, these types of behaviors were unusual for victims of sexual assault. The caseworker answered, "No, they're very common." (Tr. 246). Defense counsel did not voice an objection on improper vouching.[1]

**{¶45}** The nurse practitioner provided similar testimony. Upon noting the victim had been released from a mental hospital just prior to her appointment at the child advocacy center, the nurse practitioner testified, "She had suicidal ideation, bipolar,

---

[1] Regarding the questions to the caseworker on the contents of the hospital records, defense counsel made a different objection (hearsay with no foundation for a records exception). (Tr. 244-245).

PTSD, anxiety." When the state asked if suicidal ideation or cutting are common symptoms of a child who has been sexually or physically abused, the nurse practitioner responded in the affirmative and explained:

> So there's a couple of reasons for that. One is they have been treated so badly, in her case she was called names plus the abuse, that they begin to feel bad about themselves. And they - - so they feel worthless and helpless. Those are symptoms of depression. That's part of bipolar disorder. In addition, sometimes they have such bad emotional feelings that they can't deal with that pain of that emotional feeling. So they try to redirect that discomfort into a physical discomfort, and that's why they purposely hurt themselves . . . Cutting.

(Tr. 408). Notably, there was no objection to this testimony.

{¶46} Appellant acknowledges an expert can testify on an ultimate issue by giving an opinion on whether sexual abuse occurred. *See, e.g., State v. Boston*, 46 Ohio St.3d 108, 128 (1989) ("expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision and is, therefore, admissible"); Evid.R. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."). Appellant emphasizes the expert cannot, however, invade the function of the jury by opining the victim is credible. *See Boston* at 129 (in a case where the child did not testify and one expert opined the child did not fantasize the abuse while another expert opined the child was telling the truth, the Supreme Court ruled "an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant"). According to Appellant, an expert would essentially be giving an opinion on the credibility of the victim by disclosing a diagnosis of post-traumatic stress disorder (PTSD) and by explaining self-harm or suicidal ideation is common for victims of sexual abuse.

{¶47} Due to the lack of vouching objections, Appellant raises plain error. Pursuant to Crim.R. 52(B), plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. As the Supreme Court emphasizes, plain error is a discretionary doctrine the appellate court may choose to employ only with the utmost care in exceptional circumstances when required to avoid

a manifest miscarriage of justice. *State v. Noling*, 2002-Ohio-7044, ¶ 62. To establish plain error, the defendant must demonstrate the court committed an obvious error and must show the error affected the outcome of trial. *State v. Graham*, 2020-Ohio-6700, ¶ 93, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." *State v. Rogers*, 2015-Ohio-2459, ¶ 22.

{¶48} The state points out neither witness provided a direct opinion on the victim's truthfulness. It is also points out their reported conclusions ("substantiated" or "highly concerning") on whether sexual abuse occurred are not contested and were supported by other evidence besides the victim's allegations (including Appellant's letters). *See, e.g., State v. Cullen*, 2021-Ohio 4642, ¶ 24-26 (7th Dist.) (where the expert's opinion the case was concerning for sexual abuse was not based solely on the child's accusation but was also based on the experiential details, voice, demeanor, and other observed indicators).

{¶49} Notably, an expert is permitted to testify "that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children" as jurors may validly consider "the expert's belief the child was actually abused." *State v. Stowers*, 81 Ohio St.3d 260, 261 (1998). "Most jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse." *Id.* at 262, quoting *Boston* at 128.

{¶50} The Supreme Court has ruled that it would constitute a misinterpretation of *Boston* to argue an expert opinion improperly vouches for a child merely by saying certain behaviors are commonly observed in children who experience sexual abuse; this argument "fails to distinguish between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused." *Id.* The restriction on expert opinions on the truth of a child's statement "does not proscribe testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." *Id.* at 262-263 (such as delayed disclosure

and recantation, regardless of a defendant's argument that there is no child sexual abuse syndrome).

**{¶51}** Accordingly, testimony on the victim's mental conditions or behaviors being consistent with a victim of abuse is not improper vouching. *See, e.g., Stowers*, 81 Ohio St.3d at 261*; Cullen*, 2021-Ohio 4642, at ¶ 24-26 (7th Dist.); *State v. Fenton*, 68 Ohio App.3d 412, 431 (6th Dist. 1990) (finding it was not improper to opine that tests showing significant depression, anger, and thoughts of self-harm were consistent with a history of sexual abuse). A revealed diagnosis of PTSD is not subject to a stricter standard. *See State v. Smith*, 2016-Ohio-3418, ¶ 43 (7th Dist.) (the expert may be asked whether the victim's PTSD and depression are consistent with what is typically seen in sexually abused children); *see also State v. Jordan*, 2022-Ohio-2708, ¶ 20-28 (2d Dist.) (no plain error to allow expert testimony that victim displayed many of the symptoms related to PTSD and suffered from this disorder which is a diagnosis commonly seen in sexually abused children), citing *State v. Bidinost*, 71 Ohio St.3d 449, 454 (1994) (finding the expert properly testified about each child's PTSD diagnosis while informing the jury this diagnosis is widely applied to children who have been sexually abused, as this information was "clearly relevant and helpful in assisting the jury to understand the children's behavior" and provided the jury with information beyond common experience).

**{¶52}** We also note the contested testimony on PTSD merely listed the disorder as one of the mental health conditions with which the victim had been previously diagnosed; the witnesses did not specifically opine she suffered PTSD as a result of sexual abuse. In any event, such testimony has been approved. *See, e.g., State v. R.W.*, 2022-Ohio-2771, ¶ 53 (8th Dist.) (no plain error or improper vouching where the expert said the victim suffered from PTSD based on sexual abuse); *In the Matter of J.D.*, 2022-Ohio-2334, ¶ 34 (11th Dist.) (the therapist was not vouching for credibility by testifying he diagnosed the victim with PTSD consistent with a history of sexual abuse).

**{¶53}** Furthermore, as to the general disclosures on mental health diagnoses and self-harming conduct, the victim herself testified about these matters. She testified about being diagnosed with PTSD (along with depression and anxiety) and about her suicide attempts both before and after the December 2020 stay at the mental hospital. (Tr. 356, 360). The victim also said her self-harming conduct began in seventh grade when she

Case No. 24 CO 0016

burned her arms with erasers and cut her arms with razor blades. (Tr. 355). Additionally, the victim's mother testified as to the victim's depression, anxiety, and self-harm (including cutting her arms and legs). (Tr. 299).

**{¶54}** Finally and alternatively, a trial court may refuse to interfere in the presentation of such testimony upon reasonably assuming defense counsel had a strategic reason for failing to object (which is discussed in the next assignment of error). For instance, counsel may have decided to acquiesce to the nurse practitioner's recitation of certain diagnoses or symptoms, such as hearing voices, hoping the jury would attribute the sexual allegations to the victim's mental problems.[2]

**{¶55}** In conclusion, there was no error, plain or otherwise. In failing to sua sponte raise a vouching issue, the trial court did not commit an obvious error resulting in outcome determinative prejudice by allowing the caseworker and nurse practitioner to disclose the victim's mental health diagnoses and to explain that self-harming behavior is not uncommon in victims of sexual abuse. Appellant has not demonstrated exceptional circumstances or a manifest miscarriage of justice. *See Noling*, 2002-Ohio-7044, at ¶ 62. This assignment of error is without merit.

## ASSIGNMENT OF ERROR THREE

**{¶56}** According to the third assignment of error:

"APPELLANT CONTENDS HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL THROUGHOUT . . . THE INSTANT MATTER IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS AS WELL AS HIS RIGHTS UNDER SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION."

**{¶57}** A claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

**{¶58}** In evaluating an alleged deficiency in performance, the court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client"

---

[2] Although defense counsel objected to the caseworker's testimony about what she learned from medical records on other grounds, the nurse practitioner testified that she was required to review the psychosocial history as part of her medical diagnosis and treatment. For the purpose of theorizing on trial strategy, this may explain an objection as to one witness and not the other.

so that "counsel's representation fell below an objective standard of reasonableness." *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *Strickland* at 687-688. Our review is highly deferential to counsel's decisions as there are "countless ways to provide effective assistance in any given case" and strong presumptions the conduct was within the wide range of reasonable professional assistance. *Id.* at 142, citing *Strickland* at 689. A reviewing court should refrain from second-guessing the strategic decisions of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995).

{¶59} On the prejudice prong, the reviewing court finding must conclude there is a reasonable probability the result of the proceedings would have been different but for the serious errors committed by counsel. *Id.* at 557-558. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial counsel. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley* at 142, fn. 1, quoting *Strickland* at 693.

{¶60} Appellant specifies arguments on three subjects under this assignment of error. First, we address Appellant's ineffectiveness argument related to defense counsel's failure to object to the testimony of the caseworker and the nurse practitioner about the victim's prior diagnoses and self-harm as being common issues among victims of sexual abuse. In support, Appellant cites to his arguments in the prior assignment of error wherein he posited the admission of this testimony was plain error committed by the trial court.

{¶61} Pursuant to our explanation in the prior assignment of error, there was no error resulting in a reasonable probability of prejudice. *See Rogers*, 2015-Ohio-2459, ¶ 22 (the deferential test of "reasonable probability that the error resulted in prejudice" is the same for plain error and ineffective assistance of counsel claims). On the subject of the victim's various diagnoses (specifically PTSD), as mentioned above, defense counsel may have had a strategic reason for failing to object to the nurse practitioner's recitation of certain diagnoses or symptoms, such as hearing voices, hoping the jury would attribute the allegations to the victim's mental problems. And, a disclosure of issues with mental health or self-harm is not akin to vouching for a victim's truthfulness. Regardless, the

victim herself testified to her PTSD diagnosis (along with other conditions) and her history of self-harm, including burning, cutting, and suicide attempts. As to the testimony about self-harm being common among sex abuse victims, we reiterate this does not equate to vouching and refer to our analysis in the prior assignment of error. In sum, had defense counsel raised the issue in an objection, the vouching contention would have lacked merit.

{¶62} Next, we address Appellant's ineffectiveness argument about his request for a new attorney at a March 18, 2024 status conference, one week before trial. Defense counsel informed the trial court Appellant was unhappy with his services and wanted a new attorney to be appointed for him. (Tr. 3). Appellant complained to the court:

> he never returns my emails. I would call him, and he will wait a week to answer me back, if he answers back at all. He hasn't contacted half the witnesses he said he was going to. When I ask for updates, I don't get any, and then last week, he got sick, which was fine, but the fact that he waited until last week to get anything done when the trial is right around the corner, I'm just at a loss.

(Tr. 4-5). (Four days before this status hearing, counsel received an extension of the status hearing date due to a stomach flu.)

{¶63} The trial court pointed out counsel had been appointed more than a year earlier and Appellant voiced no concerns throughout the year, including when the last trial date was rescheduled or days prior when the last status hearing date was continued. The court found the newly-voiced dissatisfaction did not show a breakdown in the attorney-client relationship and denied the motion for new counsel. (Tr. 5-6). *Accord State v. Jones*, 91 Ohio St.3d 335, 342-343 (2001) (where the Court observed: "The record supports the trial court's determination that any problems between appellant and his attorneys had not led to a total lack of communication" and "Given the timing of the motion, and the fact that appellant had never, up to that point, expressed any concerns about his court-appointed counsel, it was reasonable for the trial court to conclude that the continuance was requested in bad faith and for purposes of delay.").

{¶64} Other than quoting the complaint he made to the trial court, Appellant does not explain how the contents of his complaint a week before trial demonstrate a serious error by counsel that affected the outcome of his trial. We note the criticism that counsel

waited until "last week" (which would have been two weeks before trial) to "get anything done" seems to indicate Appellant was complaining about past incompletions rather than the present state of affairs.

**{¶65}** As to Appellant's statement about a failure to contact unnamed witnesses, this lacked specificity for purposes of the requirement on appeal that both deficiency and prejudice are demonstrated *by the record*. *See State v. Holloway*, 2018-Ohio-5393, ¶ 50 (7th Dist.) (in the absence of evidence in the record for our review of deficiency and prejudice, any opinion on the effectiveness of counsel would be based on conjecture), citing *State v. Prieto*, 2007-Ohio-7204, ¶ 36 (7th Dist.). Any events between the status hearing and the trial are not disclosed by the record. In fact, the defense called Appellant's cousin to the stand at trial. We also point out: "The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; but, instead, whether the defense chosen was objectively reasonable." *State v. Suzuki*, 2019-Ohio-1131, ¶ 23 (7th Dist.)

**{¶66}** Lastly, Appellant complains defense counsel was ineffective for asking him on direct examination about his meeting with the sheriff's department and thereby opening the door to the state's question on his silence at the sheriff's office. Nevertheless, Appellant also contends counsel should have objected when the state asked this question on cross-examination.

**{¶67}** Upon taking the stand in his own defense, Appellant attempted to convince the jury his letters did not refer to sexual activities. In support of this claim, he said the victim's mother did not tell him the specific allegations the victim made against him. Defense counsel then elicited that Appellant went to the sheriff's department with an attorney after learning of the investigation. (Tr. 480). When asked if he made any statements to the investigators, Appellant answered: "I did not. My attorney advised me against speaking to them as they were recording the video and audio, and that would mean that it was on the record. So any utterances I might have said would be used against me." Defense counsel then asked what he would have told them if his attorney let him speak. Appellant declared, "I would've told him I didn't do it. I would have denied every charge against me." (Tr. 481).

**{¶68}** On cross-examination, the prosecution questioned Appellant on his claim that he was unaware of sexual allegations when he wrote the letters. When the prosecutor started mentioning how Appellant testified about going to the sheriff's department with an attorney and making no statement because he did not want it on the record, Appellant said, "My attorney advised me to not make a statement on the record. That was not my decision." (Tr. 512).

**{¶69}** On appeal, Appellant suggests this was improper questioning by the prosecution to which defense counsel should have objected. However, as he also recognizes, the defense opened the door to the subject. As the state points out, the defense waives the right to have post-arrest silence excluded from trial when the topic is raised by the defense, such as when the defense presents the defendant's silence as a fact in the case. *State v. Eason*, 2003-Ohio-6279, ¶ 27 (7th Dist.).

**{¶70}** "[A] defendant who voluntarily takes the witness stand waives the right to remain silent about the testimony he gives, including testimony about the defendant's prior silence . . ." *Id.*, citing *Anderson v. Charles*, 447 U.S. 404, 408 (1980), applying *Doyle v. Ohio*, 426 U.S. 610 (1976) (the state cannot use the defendant's post-arrest silence after Miranda warnings to impeach the defendant if he decides to testify at trial). "Ohio courts have agreed that a prosecutor may question a defendant about post-arrest silence, without a *Doyle* violation, if the defendant has raised the issue on direct examination." *Id.* at ¶ 29. Accordingly, the prosecutor can cross-examine the defendant on this topic if defense counsel opened the door to it on direct examination. *Id.* at ¶ 30. Defense counsel was therefore not ineffective for failing to object to the state's question, which merely prompted Appellant's reiteration of an answer elicited from his own attorney.

**{¶71}** This leaves the question of whether defense counsel was ineffective by opening the door to the subject in the first place. Notably, a defense strategy had to be developed to deal with the letters Appellant sent to the victim and her sister. As the state urges, the defense was attempting to show Appellant was unaware of sexual allegations or at least specific ones. It was also a tactical decision to have Appellant blame a prior attorney for failing to resolve the matter earlier and for deciding to refrain from making a statement to the police. There is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance, and we defer to trial counsel's strategic

decision without using hindsight to second-guess the elicitation of an explanation as to why Appellant did not make a statement to the sheriff's office. *See Bradley*, 42 Ohio St.3d at 142*; Carter*, 72 Ohio St.3d at 558. Regardless, there is no indication Appellant's testimonial disclosure of his earlier silence prejudiced him in this case where both the victim and Appellant testified at trial. This assignment of error is overruled.

## ASSIGNMENT OF ERROR FOUR

{¶72} Appellant's fourth assignment of error states:

"THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTIONS FOR RAPE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."

{¶73} Although the text of the assignment of error sounds in weight of the evidence, the arguments made thereunder raise principles related to both sufficiency of the evidence and weight of the evidence. Sufficiency of the evidence and weight of the evidence are distinct concepts with different tests and different results on a reversal. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997) (announcing the distinction by setting forth different tests and pointing out a sufficiency reversal is barred from retrial by double jeopardy but a reversal on weight of the evidence is not).

{¶74} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *Id.* at 386. An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

{¶75} In reviewing the sufficiency of the evidence, the court views all evidence, including reasonable inferences, in the light most favorable to the prosecution to ascertain whether "any" rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (consider all evidence in the light most favorable to the prosecution, including reasonable inferences); *State v. Filiaggi*, 86 Ohio

St.3d 230, 247 (1999) (viewing reasonable inferences in favor of the state); *State v. Goff*, 82 Ohio St.3d 123, 138 (1998).[3] Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

**{¶76}** The elements of Appellant's rape charge are: "engage in sexual conduct with another when . . . [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person. R.C. 2907.02(A)(1)(b). Sexual conduct includes fellatio. R.C. 2907.01(A).

**{¶77}** The pertinent elements of the gross sexual imposition charge are: "have sexual contact with another [or] cause another to have sexual contact with the offender . . . when . . . [t]he other person . . . is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4). Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

**{¶78}** We refer to our Statement of the Case above for a detailed review of the evidence. For our purposes here, we emphasize the victim testified Appellant would sneak into her room while she was sleeping on multiple occasions and put his hand down her pants and rub the outside of her vagina. He also touched her breasts and buttocks under her clothes and put her hand on his penis before causing movement. (Tr. 347-350). A rational person could conclude the purpose of the contact was to sexually arouse or gratify either person. These events constitute sexual contact (as required for gross sexual imposition). R.C. 2907.01(B).

**{¶79}** Next, the victim testified she felt and then saw Appellant insert his penis in her mouth several times during a game (after putting a blindfold on her and inserting lollipops in her mouth). (Tr. 351). This act constitutes fellatio and satisfies the definition of sexual conduct (as required for rape). R.C. 2907.01(A).

---

[3] Even in cases where a portion of the evidence presented at trial is found to be inadmissible and prejudicial under a separate assignment of error on appeal, that evidence is still included in a sufficiency review because the remedy for an evidentiary error (such as hearsay) is a new trial, not an acquittal. *State v. Peeples*, 2009-Ohio-1198, ¶ 16-17 (7th Dist.), citing *State v. Yarbrough*, 2002-Ohio-2126, ¶ 80 (where the Supreme Court emphasized a sufficiency review considers all testimony presented to the jury, whether or not it was properly admitted), citing *Lockhart v. Nelson*, 488 U.S. 33, 40-42 (1988).

**{¶80}** Finally, the victim testified all of the sexual abuse occurred before she turned thirteen years old.  We also note the allegations at trial were consistent with the disclosures made at her interview at the child advocacy center.  (St.Ex. 10).  Furthermore, Appellant wrote a letter to the victim after he was confronted by her mother who had just had the victim disclose the sexual abuse.  A rational person could view the letter as a confirmation of inappropriate sexual activity.  (St.Ex. 7).

**{¶81}** After viewing the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could find the elements of rape and gross sexual imposition were proven beyond a reasonable doubt.  Appellant's argument sounding in sufficiency of the evidence is overruled.

**{¶82}** Weight of the evidence concerns the effect of the evidence in inducing belief, and the corresponding review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387.  The appellate court considers whether the state met its burden of persuasion.  *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review).

**{¶83}** When a defendant argues a conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387.  "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."  *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.  This is because the trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor.  *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  "We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we

believe is more credible." *State v. Carter*, 2017-Ohio-7501, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

**{¶84}** Furthermore, where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. Ohio Const., art. IV, § 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins* at 389.

**{¶85}** Contrary to Appellant's contention, the evidence was not "wholly circumstantial" as the victim provided direct evidence by her testimony. In any event, as to any circumstantial evidence presented to the jury, we reiterate how direct and circumstantial evidence inherently possess the same probative value. *Treesh*, 90 Ohio St.3d at 485.

**{¶86}** The fact that the victim did not immediately tell her mother after the blindfolding incident does not negate her credibility. According to her testimony, she had been regularly subjected to nighttime acts of gross sexual imposition by Appellant. She explained how she previously tried to tell her mother after an early sexual contact event, but Appellant convinced her mother it was a dream and she succumbed to his pressure to say it was a dream. The victim mentioned other fears and reasoning in keeping the abuse a secret. In addition, she explained what prompted her to disclose the sexual abuse to her mother the day after her thirteenth birthday: her mother saw disclosure-related messages to her friend when transferring data to a new phone the victim received for her birthday. The messages were prompted by Appellant's unwanted presence at her birthday party. Contrary to another contention, it is understandable that when the victim did disclose the abuse to her mother after Appellant moved out, she did not necessarily tell her mother every detail discussed at trial about each sexual activity Appellant perpetrated upon her.

**{¶87}** The jury heard the victim's testimony live and witnessed her demeanor, voice inflection, eyes movements, gestures, and any other relevant signs of truthfulness or untruthfulness. The victim's testimony was bolstered by Appellant's own letters to the victim and her sister, as quoted in our Statement of the Case above. The jury also watched Appellant's testimony and could evaluate his denials and excuses for signs of deception.

{¶88}  Moreover, the victim's mother testified about ejecting Appellant from their house after finding him taking photographs of the victim wearing very short shorts in bed while she was sleeping.  The fact that the mother kept in contact with Appellant and invited him to holiday events in the subsequent months is not a damning fact against the victim.  As the victim's mother explained, her suspicions were aroused but Appellant was strict about the victim's clothing choices and insisted he was merely checking on the kids and wanted to show the victim how inappropriate she looked in those shorts.  Once the victim directly disclosed the sexual abuse to her mother the day after the victim's thirteenth birthday party, the mother confronted him to retrieve a key and then discontinued contact with him, helping her child report the abuse to authorities when she was emotionally ready four months later.  It was the jury's prerogative to find the testimony from the victim's mother credible.

{¶89}  In any event, nothing about the victim's testimony is unbelievable.  The jury could easily find the victim's testimony was credible and find Appellant's testimony lacked credibility.  Upon reviewing the entire record, weighing the evidence with all reasonable inferences, and considering the credibility of witnesses, we conclude the jury did not clearly lose its way in resolving conflicts in the evidence or create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *See Lang*, 2011-Ohio-4215, at ¶ 220, citing *Thompkins* at 387.  This assignment of error is without merit.

{¶90}  For the foregoing reasons, Appellant's convictions are upheld, and the trial court's judgment is affirmed.


Hanni, J., concurs.

Dickey, J., concurs.


<u>Case No. 24 CO 0016</u>

———————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**