[Cite as *State v. Aponte-Rodriguez*, 2025-Ohio-2631.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

SAMUEL APONTE-RODRIGUEZ,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0002**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CR 00318

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro*, Mahoning County Prosecutor*, Atty. Ralph M. Rivera* and *Atty. Kristie M. Weibling*, Assistant Prosecuting Attorneys, for Plaintiff-Appellee and

*Atty. Aaron M. Meikle,* for Defendant-Appellant.

Dated:  July 25, 2025

**DICKEY, J.**

{¶1} Appellant, Samuel Aponte-Rodriguez, appeals from the December 31, 2024 judgment of the Mahoning County Court of Common Pleas convicting him for rape and gross sexual imposition, sentencing him to prison, and labeling him a Tier III Sex Offender following a jury trial. On appeal, Appellant raises arguments involving hearsay and sufficiency of the evidence. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} On May 4, 2023, Appellant was secretly indicted by the Mahoning County Grand Jury on three counts: counts one and two, rape, felonies of the first degree in violation of R.C. 2907.02(A)(1)(b) and (B); and count three, gross sexual imposition, a felony of the third degree in violation of R.C. 2907.05(A)(4) and (C)(2). The charges stem from Appellant's involvement with L.R. ("the victim") (d.o.b. 7/4/2018), a then-four-year-old little girl that his stepmother, Jasmine Valentine aka "Mimi", provided child care for several days per week.

{¶3} Appellant retained counsel and pled not guilty at his arraignment on May 16, 2023. Appellant also waived his right to a speedy trial. On August 21, 2023, Appellant filed a "Written Plea Of Not Guilty And Not Guilty By Reason Of Insanity." The trial court ordered Appellant to complete a forensic examination. Following a hearing, the court found Appellant competent to stand trial.

{¶4} On November 9, 2023, Appellant's retained counsel filed a motion to withdraw. A hearing was held on November 21, 2023. On December 4, 2023, the trial court granted the request, found Appellant indigent, and appointed him new counsel. The parties engaged in discovery.

{¶5} On July 2, 2024, Appellant filed a motion in limine alleging the victim was not competent to testify at trial. Appellee, the State of Ohio, filed a response on July 22, 2024. A hearing was held on October 4, 2024. After examining the victim in the presence of counsel, the trial court deemed her competent to testify and overruled Appellant's motion.

{¶6} A final pre-trial was held on November 6, 2024. The State extended a plea offer to Appellant which he declined. Regarding the victim's competency, the trial court

determined that any statements made by the victim for the purpose of medical diagnosis and treatment were admissible.

{¶7} A jury trial was held on December 10, 2024. The State presented eight witnesses: (1) Tyler Thompson, an officer with Campbell Police Department ("CPD"); (2) Diana Bracetty, the victim's babysitter; (3) Mary Missos, a social worker supervisor at Akron Children's Hospital ("ACH"); (4) Y.A., the victim's mother; (5) the victim; (6) Jessica Langston, an emergency room physician at ACH; (7) Ryan Bloomer, a detective with CPD; and (8) Amanda McAllen, a nurse practitioner in the Child Advocacy Center at ACH.

{¶8} At trial, Bracetty identified Appellant. Y.A. also identified Appellant in court as "Mimi's son," "Samuel." (12/10/2024 Jury Trial Tr., p. 227-228, 241).

{¶9} Bracetty and Y.A. are best friends. Y.A. and the victim refer to Bracetty as "Nana." (*Id.* at p. 227). Bracetty has provided child care to the victim since the victim was an infant. Because Y.A. works full-time, she required daily child care for the victim. Until the victim reached the age of five, Bracetty babysat her daily from about 8:00 a.m. until 3:00 p.m. Once the victim started pre-school, Bracetty provided child care after school until approximately 6:30 p.m. when Y.A. ended her work day. When the victim was on a break from school, Bracetty would provide child care all day.

{¶10} In August of 2022, Bracetty began other employment and worked on Mondays, Wednesdays, and Fridays until 2:00 p.m. Because Y.A. still needed child care assistance, Bracetty suggested that her sister, Valentine, aka "Mimi," assist on the days Bracetty was working elsewhere. (*Id.* at p. 265). Because Y.A. has known Mimi since her childhood, she was comfortable with her providing child care for the victim. Mimi agreed to help out and began providing child care when Bracetty was unavailable. Bracetty confirmed that at the time Mimi provided child care to the victim, Mimi only resided with her husband and her stepson (Appellant). On the days Mimi provided child care for the victim, Bracetty would pick her up from Mimi's home around 2:15 p.m. and watch her until Y.A. returned from work.

{¶11} On the morning of December 30, 2022, Y.A. dropped the victim off at Mimi's house. Appellant answered the door and took the victim inside. Bracetty picked up the victim later that afternoon. During the car ride home from Mimi's house, the victim was uncharacteristically quiet. Within 15 minutes of returning to her home, Bracetty observed

the victim fidgeting. Upon further inquiry, the victim indicated she was experiencing itchiness, burning, and pain in her lower private areas. Concerned that the victim did not wipe that area well, Bracetty bathed the victim and changed her into clean underwear and pajamas. The bath did not soothe the victim as she continued to complain that her lower private areas were burning and hurt. Thinking the victim had a urinary tract infection, Bracetty notified Y.A. The next morning, because the victim was still experiencing pain and burning in her lower private areas, Y.A. took her to urgent care.

{¶12} At urgent care, the medical provider requested that the victim provide a urine sample. While in the bathroom, the victim, upon questioning from Y.A., said that Mimi's son (Appellant) inappropriately touched her private areas. Y.A. was shocked, upset, and overwhelmed upon learning that someone she trusted sexually abused her four-year-old daughter. Y.A. returned home to process this traumatic information. On January 2, 2023, Y.A. again asked the victim if anyone had touched her private areas. The victim responded that Mimi's son (Appellant) was the aggressor. Y.A. videotaped the conversation and turned the video over to the CPD. Y.A. took the victim to the emergency department at ACH. Upon arriving, Y.A. reported to the medical staff that the victim had disclosed she was sexually abused. CPD was notified of the sexual assault.

{¶13} Dr. Langston was assigned to diagnose and treat the victim. As part of her medical examination, Dr. Langston obtained a history from Y.A. that included a sexual abuse disclosure. Social Worker Missos was assigned to complete a diagnostic interview. Before the diagnostic interview, Dr. Langston completed a general head-to-toe physical examination of the victim. In order to lessen the emotional impact of a full sexual abuse examination on the victim, Dr. Langston deferred that portion of the medical exam until she received the information obtained through the diagnostic interview with Missos.

{¶14} The purpose of the diagnostic interview was to obtain information necessary for medical providers to develop a diagnosis and appropriate course of treatment for the victim. During the diagnostic interview, Missos testified that the victim disclosed that while Mimi was babysitting her, Mimi's son (Appellant) "touched [her] and licked [her with his tongue], ew, nasty." (*Id.* at p. 212). Missos provided this information to Dr. Langston and referred the victim to the Child Advocacy Center at ACH for further diagnosis and treatment.

Case No. 25 MA 0002

{¶15} Relying on the medical history obtained during the diagnostic interview with Missos, Dr. Langston determined that a rape kit was not viable because the sexual assault occurred just outside the 72-hour window for evidence collection. However, Dr. Langston completed a genital exam on the victim. Dr. Langston observed a small irregularity on the left side of the victim's labia but did not note any discharge, bleeding, or other significant signs of trauma.

{¶16} Officer Thompson was dispatched to ACH on January 2, 2023 to complete the initial investigation of the sexual assault. Upon arrival, he initially talked with Missos. Officer Thompson determined that the victim was under Mimi's care and supervision on December 30, 2022 and was left alone with Appellant, who committed the sexual assault. Officer Thompson spoke with the four-year-old victim. Initially, the victim was playful and happy. However, once Officer Thompson began discussing the sexual assault, the victim became quiet and attached to her mother. The victim disclosed to Officer Thompson that Mimi's son (Appellant) touched and licked her vaginal area which caused her pain. Officer Thompson recorded the information obtained in his initial investigation and forwarded the report to the detective division. On January 4, 2023, Detectives Bloomer and Gulu were assigned to investigate the sexual assault.

{¶17} On January 12, 2023, the victim was seen at the Child Advocacy Center for the purpose of medical diagnosis and treatment. Courtney Wilson, a Child Advocacy Center social worker, completed a diagnostic interview with the victim which was observed in real time by Nurse Practitioner McAllen. McAllen relied on the information obtained during the diagnostic interview in determining the appropriate medical course of action to diagnose and treat the victim.

{¶18} During the diagnostic interview, the victim disclosed that Mimi's son (Appellant) touched and licked her vaginal area. The victim also made a reference to Joshua (a child who does not live with Mimi) during her discussion with Wilson. However, the victim affirmed it was Mimi's son (Appellant) who touched her private areas in Mimi's home. The victim also disclosed that Mimi's son (Appellant) told her not to tell anyone about the sexual abuse. Throughout the diagnostic interview, the victim was able to provide experiential details regarding the sexual assault that a child of her young age would not otherwise know.

Case No. 25 MA 0002

{¶19} As part of the comprehensive medical exam, McAllen completed an anal-genital exam since Appellant had penetrated the victim's vagina. Prior to completing the exam, McAllen reviewed the victim's medical history. McAllen noted that Dr. Langston observed a cut in the victim's vaginal area during the January 2, 2023 exam. This cut was not visible during the medical exam later completed by McAllen. McAllen explained that because the vagina heals quickly and because the victim had taken the antibiotic prescribed during her urgent care visit, it was likely the cut healed. McAllen rendered a medical diagnosis for the victim which was "highly concerning" for "sexual abuse." (*Id.* at p. 343).

{¶20} As part of his ongoing investigation, Detective Bloomer attended the Child Advocacy Center diagnostic interview with the victim. Detective Bloomer also obtained the video from Y.A. in which the victim disclosed that Mimi's son (Appellant) touched and licked her vaginal area. On January 30, 2023, Detective Gulu attempted to meet with Mimi at her home, at which time he interacted with Appellant and his father. Thereafter, Appellant fled, but eventually returned, and was interviewed by Detective Bloomer on February 20, 2023.

{¶21} At trial, the victim testified that Mimi used to watch her when she was four years old. The victim indicated only Mimi and Mimi's son (Appellant) were home when she was at Mimi's house. The victim called Mimi's son "Samuelito." (*Id.* at p. 266). The victim testified that Mimi's son (Appellant) touched her private parts and put his fingers inside her private parts. On cross-examination, the victim said she did not remember any information about Joshua that she previously mentioned to Wilson.

{¶22} At the conclusion of the State's case, Appellant moved for an acquittal pursuant to Crim.R. 29 which was overruled by the trial court. The defense rested without presenting evidence.

{¶23} The jury found Appellant guilty on count one, rape (with the additional finding that the victim was less than 10 years old at the time of the offense); not guilty on count two, rape; and guilty on count three, gross sexual imposition.

{¶24} On December 31, 2024, following a sentencing hearing, the trial court concurrently sentenced Appellant to 15 years to life on count one and 36 months on count

three, with 593 days of jail-time credit. Appellant was labeled a Tier III Sex Offender and was ordered to have no contact with the victim.

{¶25} Appellant filed a timely appeal and raises two assignments of error.

### ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED BY ADMITTING OUT-OF-COURT STATEMENTS IDENTIFYING THE OFFENDER AS "MIMI'S SON."**

{¶26} In his first assignment of error, Appellant argues the trial court abused its discretion in admitting out-of-court statements identifying the offender as "Mimi's son." Appellant stresses the statements were not subject to any hearsay exception.

{¶27} "The admission of evidence is within the discretion of the trial court and the court's decision will only be reversed upon a showing of abuse of discretion." *State v. Dotson*, 2018-Ohio-2481, ¶ 32 (7th Dist.), citing *State ex rel. Sartini v. Yost*, 2002-Ohio-3317. "This includes rulings on hearsay." *Dotson* at ¶ 32, citing *State v. Rupp*, 2007-Ohio-1561, ¶ 78 (7th Dist.). An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

> Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802. If the statement is not offered for the truth of the matter asserted, it is not prohibited by the hearsay rule. *State v. LaMar*, 2002-Ohio-2128, ¶ 57.

*State v. Yost*, 2025-Ohio-380, ¶ 33 (7th Dist.).

{¶28} A statement made under one of the clearly recognized non-hearsay out of court statement classifications includes a statement "'offered for the effect on a listener.'"

*State v. Heins*, 1994 WL 66900, *1 (5th Dist. Feb. 11, 1994), quoting *Weissenberger*, Ohio Evid. (Anderson Rev.1993), 254.

{¶29} Appellant believes the out-of-court statements made by the victim to Y.A. were inadmissible because they were hearsay. In support, Appellant relies on *State v. Ricks*, 2013-Ohio-3712.

{¶30} In *Ricks,* the defendant and his accomplice were charged with murder and tried separately. *Id.* at ¶ 1, 13. At the onset of the criminal investigation, the defendant was only known by his nickname "Peanut," but the identity of his accomplice was known. *Id.* at ¶ 9. During the course of the criminal investigation, the accomplice provided law enforcement with a general physical description of the defendant and location of the neighborhood where he was known to stay. *Id.* at ¶ 10. At the trial, the officer testified that the accomplice accompanied law enforcement on a drive through the identified neighborhood, and upon observing the defendant, exclaimed "'[t]hat's Peanut'" and became visibly upset and scared. *Id*. Based upon this statement, the officer testified that he contacted the occupant of the home at which the defendant was observed and uncovered the name of the defendant. *Id.* at ¶ 11. He further testified that he used this information to obtain a photograph of the defendant. *Id.* The officer testified that he showed the photograph to the accomplice who said, "'[t]hat's Peanut.'" *Id.* The accomplice did not testify at the defendant's trial. *Id.* at ¶ 38.

{¶31} The Supreme Court of Ohio in *Ricks* determined that some of the officer's testimony did explain what lead him to obtain the photograph of the defendant, but some of the testimony focused upon the out-of-court statements made by the accomplice that established "Peanut" as the defendant. *Id.* at ¶ 29. Specifically, *Ricks* determined the officer's testimony that, upon being presented with the photograph of the defendant, the accomplice stated "'[t]hat's Peanut'" was offered to prove the truth of the matter asserted, i.e., that the person in the photograph committed the crime. *Id.* at ¶ 41.

{¶32} Appellant's reliance on *Ricks* is misplaced. Unlike *Ricks,* the out-of-court statements in the case at bar made by the victim to Y.A. were not offered to prove that Appellant was Mimi's son and the sexual abuser but instead to establish the impact these statements had upon Y.A. and her response. Y.A. took the victim to urgent care under the belief that she may have had a urinary tract infection. Y.A. was shocked and dismayed

when the victim disclosed that Mimi's son (Appellant) inappropriately touched her private areas the day before. The shock of learning that someone she entrusted with the care of her little girl violated her in such an unspeakable manner guided Y.A.'s response. At trial, Y.A. testified:

> Q     And so [Y.A.], my last question, what did [the victim] say to cause you to be shocked?
>
> A     When I asked her who -- who touched her? She said Mimi's son.
>
> Q     Okay. And you hear that. Well, what's your -- what are you feeling?
>
> A     I just felt like I needed to get out of there. Like, I just needed to go home.
>
> Q      When you say out of there --
>
> A     Urgent Care.
>
> . . .
>
> Q     And so, again, what are you feeling?
>
> A     I just feel like I have to go home. Like, I'm all over the place. Like, I need to figure this out.
>
> Q     Okay. And so you go home?
>
> A     Uh-huh.

(12/10/2024 Jury Trial Tr., p. 241-242).

{¶33} Also, unlike *Ricks*, multiple witnesses in the instant matter identified Mimi's son (Appellant) as the perpetrator of the sexual abuse. As addressed in detail in Appellant's second assignment of error, Bracetty identified Appellant at trial. Y.A. also identified Appellant in court as "Mimi's son," "Samuel." (*Id.* at p. 227-228, 241).

Case No. 25 MA 0002

{¶34} On the morning at issue, Y.A. dropped off the victim at Mimi's house and Appellant accompanied the victim into the home. Bracetty revealed that about 15 minutes after picking up the victim from Mimi's house, the victim exhibited symptoms of sexual abuse. Y.A. testified the next day, the victim disclosed that Mimi's son (Appellant) inappropriately touched her private areas. Social worker Missos testified that the victim reported that Mimi's son (Appellant) touched and licked her vagina. Dr. Langston observed a small irregularity on the left side of the victim's labia. Officer Thompson said the victim disclosed that Mimi's son (Appellant) touched and licked her vagina which caused her pain. Detective Bloomer obtained the video from Y.A. in which the victim disclosed that Mimi's son (Appellant) touched and licked her vaginal area. Nurse Practitioner McAllen testified that the victim disclosed that Mimi's son (Appellant) was the perpetrator. McAllen indicated the victim revealed that Mimi's son (Appellant) touched and licked her vagina and told her not to tell anyone about the sexual abuse. McAllen rendered a medical diagnosis for the victim which was "highly concerning" for "sexual abuse." (*Id.* at p. 343). The victim testified that Mimi's son (Appellant), who she also referred to as "Samuelito," touched and put his fingers inside her private parts. (*Id.* at p. 266). The victim indicated that only Mimi and Mimi's son (Appellant) were home when she was at Mimi's house on the day at issue.

{¶35} Contrary to Appellant's claims on appeal, the out-of-court statements made by the victim to Y.A. regarding the identity of Appellant as Mimi's son are not hearsay because the statements were offered to establish their effect upon Y.A. and not for the truth of the matter asserted. *See State v. Parks*, 2005-Ohio-6926, ¶ 58 (7th Dist.), quoting *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980) ("[T]he Ohio Supreme Court recognized that out of court statements are admissible, 'to explain the actions of a witness to whom the statement was directed.'")

{¶36} In addition, the out-of-court statements made by the victim with respect to the identity of Appellant as Mimi's son at the Child Advocacy Center are admissible under Evid.R. 803(4).

{¶37} Evid.R. 803, "Hearsay exceptions; availability of declarant immaterial," states in part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

(4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Evid. R. 803(4).

{¶38} A child victim's statements made to social workers and Child Advocacy Center medical professionals for the purpose of facilitating medical diagnosis or treatment are generally admissible under the Evid.R. 803(4) medical exception to the hearsay rule in sexual abuse cases. *Matter of S.M.B.*, 2019-Ohio-3578, fn. 6 (10th Dist.), citing Evid.R. 803(4); *State v. L.E.F.*, 2014-Ohio-4585, ¶ 12 (10th Dist.); *In re T.L.*, 2011-Ohio-4709, ¶ 15 (9th Dist.).

{¶39} The Supreme Court of Ohio in *State v. Dever*, 64 Ohio St.3d 401 (1992), adopted the reasoning in *United States v. Renville,* 779 F.2d 430 (8th Cir. 1985), stating:

[In] the leading case in this area, a federal appellate court found that statements made by a child identifying the perpetrator of the sexual abuse *are* pertinent to both diagnosis and treatment of the child. The *Renville* court made a distinction between statements of fault generally (not admissible pursuant to the medical diagnosis or treatment hearsay exception) and specific statements of *identity* by children in sexual abuse cases (which the court found to be admissible). The *Renville* court found several reasons why the statement of identity is pertinent to treatment or diagnosis. The statement assists the doctor in treating any actual injuries the child may have, in preventing future abuse of the child, and in assessing the emotional and psychological impact of the abuse on the child. [fn. omitted]. *Id.*

Case No. 25 MA 0002

*. . .*

[W]e adopt *Renville's* reasoning, and hold that statements made by a child during a medical examination identifying the perpetrator of sexual abuse, if made for purpose of diagnosis and treatment, are admissible pursuant to Evid.R. 803(4), when such statements are made for the purposes enumerated in that rule. This means that a child's statement identifying his or her abuser should be treated the same as any other statement which is made for the purposes set forth in Evid.R. 803(4). We thus find that the trial court did not abuse its discretion in admitting Kristen's statement identifying Dever as her abuser.

*Dever* at 413-414.

**{¶40}** Relying on *Dever*, this court in *State v. Groves*, 2002-Ohio-5245 (7th Dist.), determined that a child victim's statement concerning the identity of her abuser may be admissible under Evid.R. 803(4). This court held that a child victim's statement to a school nurse that her "daddy" inappropriately touched her private areas was made for the purpose of medical diagnosis and treatment and thus, was admissible under Evid.R. 803(4). *Id.* at ¶ 30.

**{¶41}** Like *Groves*, on January 12, 2023, the victim here presented to the Child Advocacy Center for medical treatment and diagnosis. The victim completed a medical interview with Social Worker Wilson on the same date, which was observed in real time by Nurse Practitioner McAllen. At trial, McAllen testified that the victim disclosed, during the medical interview, that she was touched inside her vagina by Mimi's son (Appellant). McAllen indicated that she relied upon the statements made by the victim in the medical interview, including the identity of her abuser, to diagnose and treat the victim.

**{¶42}** The victim testified at trial and was subject to cross examination. During her testimony, the victim stated that Mimi's son (Appellant), who she also referred to as "Samuelito," touched and put his fingers in her private parts. (12/10/2024 Jury Trial Tr., p. 266). The victim also stated that only Mimi and Mimi's son (Appellant) were present when she was at Mimi's house on the day at issue.

Case No. 25 MA 0002

{¶43} Accordingly, the out-of-court statements made by the victim at the Child Advocacy Center with respect to the identity of Appellant as Mimi's son and the perpetrator of the sexual abuse were made for the purpose of medical diagnosis and treatment. *See Dever*, 64 Ohio St.3d at 413-414; *Groves,* 2002-Ohio-5245, at ¶ 30 (7th Dist.). Thus, the trial court did not abuse its discretion in admitting the victim's statements pursuant to the hearsay exception under Evid.R. 803(4).

{¶44} Appellant's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR ACQUITTAL BECAUSE THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE IDENTIFYING THE APPELLANT AS THE INDIVIDUAL WHO ALLEGEDLY COMMITTED THE OFFENSES.**

{¶45} In his second assignment of error, Appellant contends his convictions for rape and gross sexual imposition are not supported by sufficient evidence. Appellant asserts a child victim's reference to a nickname, without any in-court identification or testimony linking the nickname to Appellant, is not legally sufficient for identification.

"When a court reviews a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. T.D.J.*, 2018-Ohio-2766, ¶ 46 (7th Dist.).

{¶46} "'[C]ircumstantial evidence and direct evidence inherently possess the same probative value.'" *State v. Biros*, 78 Ohio St.3d 426, 447 (1997), quoting *Jenks* at paragraph one of the syllabus.

{¶47} For the reasons addressed below, we determine the judgment is supported by sufficient evidence.

{¶48} Appellant takes issue with the guilty finding for rape, a felony of the first degree in violation of R.C. 2907.02(A)(1)(b) and (B), which states:

> (A)(1) No person shall engage in sexual conduct with another when any of the following applies:
>
> . . .
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> . . .
>
> (B) Whoever violates this section is guilty of rape, a felony of the first degree.

R.C. 2907.02(A)(1)(b) and (B).

{¶49} Appellant also takes issue with the guilty finding for gross sexual imposition, a felony of the third degree in violation of R.C. 2907.05(A)(4) and (C)(2), which states:

> (A) No person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> . . .
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.
>
> . . .
>
> (C) Whoever violates this section is guilty of gross sexual imposition.
>
> . . .

(2) Gross sexual imposition committed in violation of division (A)(4) or (B) of this section is a felony of the third degree.

R.C. 2907.05(A)(4) and (C)(2).

{¶50} In this case, the State presented sufficient evidence establishing that Appellant is Mimi's son and that Appellant sexually assaulted the four-year-old victim.

{¶51} As stated, at trial, Bracetty identified Appellant. Y.A. also identified Appellant in court as "Mimi's son," "Samuel." (12/10/2024 Jury Trial Tr., p. 227-228, 241).

{¶52} Officer Thompson testified that at the time of the sexual assault, the victim was in the care of a family friend and she was left alone with the caregiver's (Mimi) stepson, who he identified as Appellant. Officer Thompson indicated that the victim disclosed that Mimi's son (Appellant) touched and licked her vagina which caused her pain.

{¶53} Bracetty testified that Valentine, aka "Mimi," is her sister. Mimi provided child care for the victim on December 30, 2022. Bracetty indicated that Mimi resided with her stepson (Appellant) and her husband. On the morning at issue, Y.A. dropped off the victim at Mimi's house and Appellant accompanied the victim into the home. Bracetty revealed that about 15 minutes after picking up the victim from Mimi's house later that day, the victim exhibited symptoms of sexual abuse.

{¶54} Y.A. testified that the day after the sexual assault, the victim disclosed that Mimi's son (Appellant) inappropriately touched her private areas. Social worker Missos testified that the victim reported, during her diagnostic interview, that Mimi's son (Appellant) touched and licked her vagina. Dr. Langston observed a small irregularity on the left side of the victim's labia.

{¶55} As part of his ongoing investigation, Detective Bloomer attended the Child Advocacy Center diagnostic interview with the victim. Detective Bloomer also obtained the video from Y.A. in which the victim disclosed that Mimi's son (Appellant) touched and licked her vaginal area. Detective Bloomer revealed that Detective Gulu initiated contact with Appellant at Mimi's house. After that encounter, Detective Bloomer said Appellant fled the jurisdiction and returned at a later date.

{¶56} Nurse Practitioner McAllen testified that the victim disclosed that Mimi's son (Appellant) was the perpetrator. McAllen indicated the victim disclosed that Mimi's son (Appellant) touched and licked her vagina and told her not to tell anyone about the sexual abuse. Throughout the diagnostic interview, the victim was able to provide experiential details regarding the sexual assault that a child of her young age would not otherwise know. As part of the comprehensive medical exam, McAllen completed an anal-genital exam since Appellant had penetrated the victim's vagina. McAllen rendered a medical diagnosis for the victim which was "highly concerning" for "sexual abuse." (*Id.* at p. 343).

{¶57} Lastly, the victim testified that Mimi's son (Appellant), who she also referred to as "Samuelito," touched and put his fingers inside her private parts. (*Id.* at p. 266). The victim indicated that only Mimi and Mimi's son (Appellant) were home when she was at Mimi's house. Finally, the victim testified on cross-examination that she did not remember discussing Joshua with Wilson during the diagnostic interview.

{¶58} Pursuant to *Jenks,* 61 Ohio St.3d 259, there is sufficient evidence upon which the jury could reasonably conclude beyond a reasonable doubt that Appellant was the perpetrator and that the elements of rape and gross sexual imposition were proven. Thus, the trial court did not err in overruling Appellant's Crim.R. 29 motion.

{¶59} Appellant's second assignment of error is without merit.

## CONCLUSION

{¶60} For the foregoing reasons, Appellant's assignments of error are not well-taken. The December 31, 2024 judgment of the Mahoning County Court of Common Pleas convicting Appellant for rape and gross sexual imposition, sentencing him to prison, and labeling him a Tier III Sex Offender following a jury trial is affirmed.

Waite, J., concurs.

Hanni, J., concurs.

Case No. 25 MA 0002

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**NOTICE TO COUNSEL**

**This document constitutes a final judgment entry.**